IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-95-142-55 |
| | § | CIVIL ACTION NO. H-04-1322 |
| RENE B. GONZALEZ | § | |
| | § | |
| | § | |
| Defendant-Movant. | § | |

## MEMORANDUM AND RECOMMENDATION

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. § 2255 is Movant Rene B. Gonzalez'§ 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 5299),[1] Movant's Memorandum in Support of § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 5363), Movant's Notice of Judicial Cognizance (Document No. 5405), the Government's Amended Answer and Amended Motion for Summary Judgment (Document No. 5429, 5430), and Movant's Response to the Government's Motion for Summary Judgment (Document No. 5413). After reviewing the parties' submissions, the record of the proceedings before the District Court in the underlying criminal case, and the applicable case law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that the Government's Amended Motion for Summary Judgment (Document No. 5430) be GRANTED, that Movant's §

---

[1] Rene B. Gonzalez' Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in Civil Action H-04-1322, and at Document No. 5299 in Criminal Action H-95-142. References hereafter will be to the criminal document numbers unless otherwise indicated.

2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 5299) and Notice of Judicial

Cognizance (Document No. 5405) both be DENIED, and that this § 2255 proceeding be

DISMISSED.


I.      **Procedural History**

Movant Rene B. Gonzalez ("Gonzalez"), who is currently in the custody of the United States

Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C. § 2255.  This is Gonzalez'

first attempt at § 2255 relief.

On October 10, 1996, Gonzalez and seventy-eight co-defendants were charged in a 197 count

sixth superseding Indictment, which arose out of a drug-trafficking organization headquartered in

Starr County, Texas.  (Document No. 19).  The superceding indictment charged various defendants

with narcotics distribution, money laundering, conspiracy to evade currency reporting requirements,

failure to file tax forms, aiding and abetting the use of a communication facility, aiding and abetting

travel in foreign and interstate commerce, conspiracy to travel in aid  of a racketeering enterprise,

conspiracy to obstruct justice, obstruction of justice, and continuing criminal enterprise.  Gonzalez

was implicated in 9 of those counts.[2]  Gonzalez  pleaded guilty, pursuant to a written Plea

Agreement, to conspiracy to possess with intent to distribute 1,000 kilograms of more of marijuana,

in violation of §§ 841(a)(1), (b)(1)(A)(vii) and 846 (count one), and conspiracy to launder monetary

instruments in violation of 18 U.S.C. § 1956(g) and (h) (count five).  (Document No. 2766).  Under

the written Plea Agreement (Document No. 2766), Gonzalez waived his right against self-

_____

[2] Gonzalez was charged in counts 1, 20, 135, 136-137, 139, 161, 162, and 163.  (Document
No. 19).

2

incrimination, agreed not to seek bankruptcy protection, voluntarily forfeited his interest in the assets identified in the Plea Agreement, and waived his right to a direct appeal. (Document No. 2766, Transcript of Rearraignment Hearing, Document No. 4974, pp. 9-10). The Government, in exchange for Gonzalez' plea, agreed not to oppose a two level decrease for acceptance of responsibility, and to dismiss the remaining counts, after sentencing. (Document No. 2766, Transcript of Rearraignment Hearing, Document No. 4974, pp. 10-11). In addition, the Plea Agreement set forth the manner in which his sentence would be calculated, and the penalties for the offenses, to which Gonzalez agreed to plead guilty, as follows:

The Defendant Agrees:

4. The defendant understands that the sentence to be imposed is within the discretion of the sentencing judge. If the Court should impose any sentence from the minimum mandatory up to and including the maximum established by statute, the defendant agrees that he will not, for that reason alone, seek to withdraw his guilty plea or pursue an appeal and will remain bound to fulfill all of the obligations under this plea agreement.

5. The defendant understands that the defendant's sentence will be imposed in accordance with the *Sentencing Guidelines and Policy Statements*. The defendant nonetheless acknowledges and agrees that the Court has jurisdiction and authority to impose any sentence within the statutory minimum or maximum set for the offense to which the defendant pleads guilty. The defendant is aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed. Knowing that, the defendant waives the right to appeal the sentence or the manner in which it was determined or on any ground whatsoever. This agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(B).

6. In agreeing to this waiver, the defendant is aware that a sentence has not yet been determined by the Court. The defendant is also aware that any estimate of the probable sentencing range under the sentencing guidelines that the defendant may have received from the defendant's counsel, the United States or the Probation Office, is a prediction, not a promise, and is not binding on the United States, the Probation Office or the Court. The United States has not and does not make any promises or representation as to what sentence the Court will impose. The Defendant

3

having been advised of the uncertainty in estimating the sentence to be imposed, knowingly waives the right to appeal that sentence in exchange for the concessions made by the United States in this plea agreement. Defendant agrees that paragraphs 4 and 5are applicable to this paragraph.

\*\*\*

The United States Agrees:

8.   The United States reserves the right to carry out its responsibilities under guidelines sentencing.  The United States reserves the right to provide factual information to the sentencing court, including but not limited to the presentence investigation and the right of allocution at sentencing.  Specifically, the United States reserves the right: (a) to bring its version of the facts of this case including its file and any investigative files to the attention of the Probation office in connection with that office's preparation of a presentence report; (b) to dispute and/or object to sentencing factors or facts material to sentencing; (c) to seek resolution of such factors or facts in conference with opposing counsel and the Probation office and (d) to file a pleading entitled "Positions of Parties with Respect to Sentencing Factors" and/or objections to the PSR, in accordance with Section 6A1.2 of the *Sentencing Guidelines, Policy and Order of Statements*.  The United States is free to take any position it chooses at and regarding sentencing except to the extent and as specifically stated below: Should in the United States' judgment, the defendant clearly demonstrate[s] acceptance of responsibility as contemplated by the sentencing guidelines, the United States will not oppose a decrease of the offense level by two (2) levels.

\*\*\*

General Provisions

2.   The defendant understands that sentencing is imposed in accordance with the *Sentencing Guidelines and Policy Statements* and that the penalty for a violation of Title 21, United States Code, Section 846 and 841 conspiracy to possess/distribute 1,000 kilograms or more of marijuana is a mandatory term of imprisonment of not less than ten years up to and including life imprisonment and a fine of $4,000,000 and criminal forfeiture of the assets named in the indictment and/or any asset listed in any notice of forfeiture filed in this case. In addition to the term of imprisonment, a term of supervised release of five years may be imposed.  The penalty for a violation of Title 18 U.S.C. 1956(g) and (h) is a maximum term of imprisonment of twenty years and a fine of not more than $500,000 or twice the value of the property involved whichever is greater.  In addition to the term of imprisonment, a term of supervised release of not more than three years may be imposed.  Therefore, the

maximum possible penalty is life imprisonment plus 20 years, $4,500,000 in fines, and 8 years of supervised release.  A mandatory special assessment of $100.00 as to each count, for a total of $200.00 shall be imposed at sentencing....

\*\*\*

8.  The defendant understands that nothing in this plea agreement, however, will restrict access by the Probation Office or the Court to information and records in the possession of the United States, including those obtained from the defendant. (Document No. 2766).

At Gonzalez' May 29, 1998, Rearraignment hearing,[3] the Court engaged in an extended colloquy to ensure that Gonzalez had reviewed the written Plea Agreement, had discussed it with his attorney, and that he understood the charges against him, the maximum penalties, the rights he was waiving, including the right to appeal, the factual basis of the plea, and the manner in which his sentence would be calculated. (Document No. 2765, Transcript of Rearraignment Hearing, Document No. 4974).  With respect to Gonzalez' understanding of the plea agreement, including the waiver of his right of appeal, the maximum penalties, and the calculation of his sentence, the following exchanges took place between Gonzalez and the Court regarding Gonzalez' understanding of the plea agreement and the manner in which his sentence would be calculated:

> Ms. Lombardino: As to Mr. Gonzalez, pursuant to Rule 11(e)(1)(B), the defendant agrees to plead to Count 1, which charges a violation of Title 21, United States Code, Section 846, and conspiracy to distribute and possess with the intent to distribute a thousand kilograms or more of marijuana, and Count 5, which is conspiracy to launder monetary instruments.

> The defendant agrees to waive his right against self-incrimination for the purposes of this agreement, will not seek bankruptcy protection as stated in the agreement, and the defendant agrees to waive his right to appeal pursuant to 18 United States Code, Section 3742.

---

[3] Gonzalez and his wife, Yvette Riojas Gonzalez, were rearraigned at the same hearing.  All references herein are to Mr. Rene Gonzalez.

The defendant also agrees to [voluntarily] forfeit and does forfeit his interest in the assets listed in Exhibit A of the plea agreement, and at the request of the United States, the defendant agrees to voluntarily take whatever steps and perform whatever acts are necessary to transfer ownership, title, custody of the Exhibit A assets as set forth in more detail in Paragraph 7 of the defendant's plea agreement.

The defendant acknowledges under – that the assets are forfeitable under Title 21, Section 853(a)(1), (a)(2), 881 and/or Title 18, United States Code, 982 and 981.

The United States reserves the right to provide information regarding the presentence report and its right to allocute at sentencing as set forth in the written plea agreement.

\*\*\*

Yes.  Should in the United States' judgment the defendant clearly demonstrate[s] acceptance of responsibility, the United States will not oppose an offense level decrease of two.

The defendant understands and agrees that the Court is not required to accept these recommendations or agreements as stated in the written plea agreement and should the Court reject this agreement recommendation, the defendant understands and agrees he will not be permitted to withdraw his guilty plea nor contest on appeal the sentence imposed on these or any other grounds.

The defendant also agrees that the United States has the sole discretion to determine whether or not the defendant has complied with the written plea agreement.

Should the defendant fail to comply as set forth in the written agreement, the defendant's plea and sentence and forfeitures will stand, and the United States may prosecute the defendant as set forth in the written plea agreement.

Should the defendant comply with the plea agreement, United States, after sentencing, will move to dismiss the remaining counts involving this defendant.

\*\*\*

The Court: Mr. Gonzalez, does that – [sound like an accurate summary of your written plea agreement in this case?]

\*\*\*

The Defendant: That's okay.  Yes, ma'am, it sure does.

6

The Court: Okay.  Have each of you had an opportunity to read your separate plea agreements in this case? ...  Have you had a chance to go over it and read it?

***

Mr. Gonzalez?

The Defendant: Yes, ma'am, I sure have.

The Court: Do each of you feel like you understand the written plea agreement?

***

The Defendant: Yes, Ma'am.

The Court: Do you have any questions you would like to ask about it now, or anything you feel like you need to clear up that you don't understand?

***

The Defendant: No, Ma'am.

The Court: Has anyone made any other or different promise or assurance to you of any kind, not contained in this written plea agreement, in an effort to persuade you to plead guilty in the case?

***

The Defendant: No, Ma'am.

The Court: So if I sat down and read each of your plea agreements, that would be all that– all the agreements you have with the government concerning your plea of guilty?  In other words, there wouldn't be any kind of side agreement or under the table agreement or any kind of agreement that you all are relying on as part of your plea agreement?

***

The Defendant: No, Ma'am.

The Court: Do each of you understand that your plea agreements or your agreements are with the government and that I am not bound by your plea agreement, so that if the Government, pursuant to that plea agreement, should move, for example in your

case, Mrs. Gonzalez, move, makes a 5K1.1 downward departure motion, or the Government makes a recommendation pursuant to this written plea agreement, and I don't agree with it, in other words, I don't think you deserve a 5K1.1 should they make that motion, or if I reject some kind of recommendation that they may make, that you are still going to be bound by your plea of guilty?  You are still going to be bound by the plea of guilty, and you will not be given an opportunity at that point, at the time of sentencing, to withdraw your plea of guilty?  Do you understand that [Mr. Gonzalez]?

***

The Defendant: Yes, Ma'am.

***

The Court:  Do each of you understand that the offenses to which you are pleading guilty are felony offenses, and that if you are found guilty of those offenses, that is if your plea is accepted, you will be found guilty of those offenses and such adjudication may deprive you of valuable civil rights, such as the right to vote, the right to hold public office, the right to serve on a jury and the right to possess firearms?

Do you understand that, [Mr. Gonzalez]?

***

The Defendant: Yes, Ma'am.

***

The Court: Okay.  So I will go over the penalties for the two counts for each of you at the same time.

The penalties for Count 1 are– the conspiracy to possess with intent to distribute marijuana of 1000 kilograms or more, imprisonment for a mandatory minimum of ten years up to life imprisonment, a fine of up to 4 million dollars, and at least five years supervised release.

For Count 5 it is imprisonment of up to 20 years, a fine of up to $500,000, or twice the value of the property involved in the transaction, and a supervised release of not more than three years.

And there would be a $100 special assessment for each count of the conviction. Two counts would be $200.

\*\*\*

Do each of you understand those are the maximum possible penalties I have just outlined? The prison term, the fine, the special assessments and the supervised release with conditions. Those are the maximum possible penalties that you are facing as a result of your plea of guilty this morning. Do you understand that, [Mr. Gonzalez]?

\*\*\*

The Defendant: Yes, Ma'am.

The Court: Under the Sentencing Reform Act of 1984, the United States Sentencing Commission has issued guidelines for judges to follow to determine what the sentence will be in a criminal case.

Have each of you discussed with Mr. Ramirez how those sentencing guidelines may apply in your case?

\*\*\*

The Defendant: Yes, Ma'am.

The Court: And do each of you understand that I will not be able to determine what your sentence will be until after a pre-sentence report has been written and we have had a sentencing hearing?

Do you understand that, [Mr. Gonzalez]?

\*\*\*

The Defendant: Yes, Ma'am.

\*\*\*

The Court: All right. Now, under the sentencing guidelines, I want to also point out to you how that works and the way this sentencing hearing works and the sentencing process works.

After I order, after– if you plead guilty this morning and your plea is accepted, I will then order the probation office to begin the process of preparing this pre-sentence report to help me to determine what sentence you should get.

The probation officer is a person who works for the Court.  In other words, that person is working for me, not the Government and not you, but for me.

And he or she will make an independent assessment and evaluation of each of your cases, and that will be a good part of the report.

In the report, there will be certain recommendations concerning the facts of each of your cases and also a recommendation concerning how the guidelines would apply to those facts.

And after that report is complete, you and your attorney and the Government will be given a copy of the report and you will be given the opportunity to make any objections you may have, either to the facts reported in the report or the way that the probation officer has applied the guidelines to the facts in that report.

We will then have a sentencing hearing and at that sentencing hearing, I will consider the report.  I will have already read the report and will have considered that, but I will – I will make rulings on any objections you may have to the report.  I will make rulings on any motions that the Government may file at that time, any recommendation the government may make.

I will also listen to what you have to say, what your lawyer has to say, and I will consider any issue or matter that has been raised concerning what sentence you will get.

After I – we have gone through that sentencing hearing, I will then make a determination of what sentence that I feel is the proper sentence in your case.  And that is the first time all of us will find out what your sentence is going to be in the case.

It may be that the sentence that I determine, that I hand down, is more severe than the sentence that you and Mr. Ramirez may have talked about when you were discussing how the guidelines applied in your case.

And if my sentence is more severe than the sentence that you are expecting to get as you are standing here today, you will not be given an opportunity at that point to withdraw your plea of guilty.

\*\*\*

Do you understand that, Mr. Gonzalez?

The Defendant: Yes, Ma'am.

\*\*\*

The Court: But do you also understand that by entering into this written plea agreement, in other words by signing this written plea agreement this morning, you will have waived or given up any right that you have to appeal any sentence that I impose?

\*\*\*

The Defendant: Yes, Ma'am.

\*\*\*

The Court: Do each of you understand that you have a right to plead not guilty to any offense charged against you and to persist in that plea, and that if you persisted in your plea of not guilty, you would have the right to a trial by jury or by judge?

At that trial, you would have the right to the assistance of counsel in your defense. You would have the right to see and hear all the witnesses and have them cross-examined in your defense.

You would have the right on your own part to decline to testify unless you voluntarily elected to do so in you[r] own defense, and you would have the right to the issuance of subpoenas or compulsory process to compel the attendance of witnesses in your defense.

\*\*\*

Do you understand that, Mr. Gonzalez?

The Defendant: Yes, Ma'am.

The Court: Do you also understand that at trial, the jury would be told that they must presume your innocence.  But you would be presumed by the trier of fact, either the judge or jury, to be innocent until such time as the Government had brought sufficient evidence to convince the trier of fact of your guilt beyond a reasonable doubt?  And the jury would be told that you had the right not to testify unless you decided to do so, and that you had– that they could not expect you to put on any evidence or to testify.

11

They could also not expect you to prove your innocence because that would not be your job to prove your own innocence, but rather it would be the government's job to prove the evidence in the case.

They would also be told that they could not hold it against you as some indication of your guilt if you chose not to testify or to put on any evidence in your defense.

Do you understand that those are the things the jury would be told at the time of trial if we had a trial in this case?

Do you understand that, [Mr. Gonzalez]?

***

The Defendant: Yes, ma'am.

The Court: And do you further understand that by entering a plea of guilty this morning, there will be no trial in this case and you will have waived or given your right to a trial, as well as all rights associated with a trial that I have just outlined for you a few minutes ago?  Do you understand that, [Mr. Gonzalez]?

***

The Defendant: Yes, ma'am.

***

The Court: Okay.  What I am going to do now is go over with you the essential elements of these two counts.  And by essential elements, I simply mean what the government would have to prove, the pieces of the puzzle the government would have to prove beyond a reasonable doubt to the trier of fact before you could be found guilty of each of these, because I want to be sure I understand that you understand what it is you are pleading guilty to this morning.

For Count 1, the essential elements are that there was a conspiracy to possess with the intent to distribute or the distribution of 1,000 kilograms or more of marijuana, which is a violation of Title 21, United States Code, Section 841(a)(1)(1) and 846.

The essential elements are this conspiracy existed– and by conspiracy I mean that an agreement between two or more persons to distribute or possess with the intent to distribute a controlled substance.

12

Second, that you, each of you, as a defendant, knew of the unlawful purpose of the agreement, and third, that each of you knowingly or intentionally joined in the agreement.

Do each of you under[stand] those are the essential elements of count 1 of the indictment?

***

The Defendant: Yes, ma'am.

The Court: All right.  For Count 5, the essential elements – they are basically, they are kind of a two part essential element package.

The first part has to do with the conspiracy to launder monetary instruments in violation of 18 United States Code, Section 1956(g) and (h).

And the essential elements of the conspiracy are two or more persons made an agreement to violate the money laundering laws.

Second, each of you knew of the unlawful purpose of the agreement, and third, each of you knowingly and intentionally joined in the agreement.

Now, coupled with that, there is also the money laundering aspect of this, and I am going to go over the essential elements of money laundering, which is a violation of 18 United States Code, Section 1956(a)(1)(A)(i), and (a)(1)B)(i) or (ii).

First, each of you knowingly conducted a financial transaction.  Second, the financial transaction involved the proceeds of a specified unlawful activity, namely narcotics trafficking.

Third, each of you knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

And, fourth, that each of you intended to promote the carrying on of the specified unlawful activity, or, fifth, knowing that the transaction was designed in part to conceal, disguised the nature, the source, ownership or control of the proceeds of the specified unlawful activity, or, six, knowing that the transaction was designed in whole or in part to avoid a transaction recording requirement under state or federal law.

13

[Mr. Gonzalez], do you understand the essential elements of both the conspiracy to commit money laundering and the underlying essential elements of the money laundering statute?

The Defendant: Yes, ma'am.

The Court: Okay.  Ms. Lombardino, would you tell me what it is the government is prepared to prove if we went to trial in the case.

Ms. Lombardino: Yes, your Honor.  Beginning in the early 1980s and continuing through 1996, a group of individuals, the heads of which are Pedro Moreno, Ricardo Riojas, Ramiro Riojas, Roberto Riojas, Cesar Moreno, Sr., Eduardo Moreno, Luis Moreno, Lazaro Moreno and Rudolfo Arias formed an organization whose goal it was to possess for the distribution and to distribute marijuana to customers who were located in places such as Houston, Texas, Chicago, Illinois, Detroit, Michigan, Ohio, and Atlanta, Georgia, and elsewhere throughout the United States.

During its tenure, 100-plus persons joined in this illegal purpose.  Primarily the organization operated in Starr County, Texas with salespersons and operations in Houston, Texas.

Generally the marijuana would be imported into the United States into the Starr County, Texas area, where it would be stored temporarily until its transportation, usually by vehicle, to persons in Houston, Chicago, Detroit, Michigan, Ohio and other states throughout the United States.

It would be sold and the currency from the sale of marijuana would be returned to the heads of the Moreno Riojas organization or others in their employ in Starr County, Texas and Houston, Texas.

The members of the organization would be paid for their participation.  All in all the organization was responsible for the distribution or possession for distribution in excess of three-quarters of a million pounds of marijuana.

It was also part of the conspiracy that when any member was arrested in connection with marijuana trafficking activities of the organization, the heads of the organization would hire and/or pay attorneys, post bond, provide currency from the sale of marijuana to post bail, and provide currency for the support of families of their arrested co-conspirators.

In exchange, the arrested co-conspirators were expected to and did conceal the organization's marijuana trafficking activities and did conceal the other members' participation in those criminal activities, particularly the identifying the heads of the

14

organization and their closest co-conspirators.  This enabled the enterprise to continue its marijuana trafficking activities.

In particular, your Honor, to summarize the bulk of these defendants' involvement in the conspiracy, I will begin by discussing a little bit about Rene Gonzalez and also Yvette Gonzalez.

Rene Gonzalez discusses with Maurice Gordon becoming a member of the Moreno Riojas organization.  As a result of these discussions, Maurice Gordon agrees initially to travel from his residence in Corpus Christi, Texas to Detroit, Michigan and other places where he is to pick up money from the sale of marijuana and return the money to Rene Gonzalez.

Gordon performs these services at Rene Gonzalez' direction on at least five occasions.  Initially, Rene Gonzalez supplied marijuana to an individual in the Detroit, Michigan area called Roberto Ramos.  As necessary, he, too, would travel from Starr County, Texas to pick up money from the sale of marijuana.

Money from the sale of marijuana would also be wire transferred from the Detroit area to Rene Gonzalez in either Starr or Zapata Counties.

Rene Gonzalez also would pick up money and oversee the transportation of marijuana to co-conspirators located in the Houston, Texas area.  The money, the money from these episodes would be usually returned to Ricardo Riojas and/or Pedro Moreno.

Beginning on or about September 28, 1995, and through November 1 of 1995, conversations were intercepted pursuant to court-authorized wire interception located at the Golden R Meat Market and the residence of Ricardo Riojas.

Persons that are intercepted are Ricardo Riojas, Yvette Gonzalez, Rene Gonzalez, Luis Riojas, Ramiro Riojas and other co-conspirators, in which they discuss and plan the transportation and distribution of marijuana to Roberto Ramos and Miguel Gutierrez in Detroit, Michigan.  This marijuana is transported to Detroit, Michigan on or about November 1, 1995.

Conversations leading up to this distribution of marijuana can be summarized as follows. On October 9, 1995, Ricardo Humberto Riojas agreed to delay the shipment of marijuana to the persons in Detroit, Michigan when Yvette Gonzalez advises him that she and Rene Gonzalez have been under surveillance by law enforcement officials.

On November 1, 1995, Ramiro Riojas advises Ricardo Riojas that all went well, a coded reference that the marijuana has been delivered to the area.

On November 9, 1995, Ricardo Riojas is advised by Miguel Gutierrez that there has been a problem.  He has not received his part of the marijuana.

Ricardo Riojas then instructs Rene Gonzalez and Yvette Gonzalez to get in touch with them.  That is Miguel Gutierrez and/or Roberto Ramos.  Both of the defendants start paging Roberto Ramos.

Yvette Riojas– I mean Yvette Gonzalez advises Lilia Riojas that Roberto is not responding to the pages.  Later that same day, Ramos calls Ricardo Riojas and tells him not to worry, he will do it tomorrow.  In other words, deliver that part of the marijuana to Miguel Gutierrez.  Ricardo Riojas relayed that to Miguel Gutierrez.

On November 14, 1995, Ramos then contacted Yvette Gonzalez and tells her that the guy has backed out of the deal.  Tell Ricardo to give me a better price and I will sell it all in two weeks.

Yvette Gonzalez discusses this with both Rene Gonzalez and Ricardo Riojas, and eventually an agreement is reached between Ricardo Riojas on November 14, 1995 and Ramos, and a price is renegotiated on that day of [$]650 a pound rather than $675 a pound.

On December 13, 1995 Ricardo Riojas updates Roberto Riojas on the status of the shipment.  Ramos promises to have something, that is money, by Christmas.

On or about December 9, 1995, and pursuant to these discussions that they have had on the wire tap, Maurice Gordon, at the direction of Rene Gonzalez, travels to Detroit to pick up currency from the sale of the marijuana that had previously been delivered.

On that same day, Rene Gonzalez talks to Maurice Gordon at a hotel in Detroit, Michigan, and Gordon advises Rene that he just got called.

Rene instructed Gordon that once he gets it– this is the code for the money– to beep him, Rene, and put in all 9s, once again code for the fact that the money had been picked up.

On December 14, 1995, law enforcement officers who are conducting surveillance on Maurice Gordon follow him to his hotel, where he checks out and heads for the airport.

16

At the airport, approximately $55,980 United States currency is recovered from Maurice Gordon.  This represents proceeds from the sale of marijuana.

Before that occurs, however, that afternoon Roberto Ramos calls Yvette Gonzalez and tells her that the animal had left, once again a coded reference to Ramos' delivery of the money from the sale of marijuana from Maurice Gordon, which was then ultimately seized by law enforcement officials.

The following day Lilia Riojas gets a telephone call from Maurice Gordon.  Gordon tells Lilia Riojas that he needs the number to the fax machine.  She puts another individual on the phone who gives the number to Gordon.

Gordon tells Jose Luis Cantu to let Yvette Gonzalez know that he is faxing something to her.  At this point Gordon had been told that Ricardo Riojas is asking for proof that the money– that is the drug proceeds–that was taken by law enforcement officers was in fact taken by law enforcement officers.

On December 16, 1995, Yvette Gonzalez calls Rene Gonzalez and reads the facsimile over the telephone.  Yvette says that Roberto Ramos told her that he had given Gordon $65,000.

Rene Gonzalez responds that that still leaves $70,000.  This is the $70,000 referred to by Rene Gonzalez as money that is still owed to the Riojases for the sale of marijuana.

After these events, on January 19, 1996 agents observed Ricardo Riojas and another individual aboard a flight to McAllen, Texas where they fly to Detroit, Michigan.  They check into a hotel at that location and place telephone calls to the residences of Rene Gonzalez and Pedro Moreno and others.

On January 20, 1996, agents also observe Riojas and the other individual meeting with Roberto Ramos.  On January 21, 1996, Riojas and Franco and this other individual return to Texas.

Beginning on January 8, 1996, communications were intercepted which lead to another seizure which is described below. Ricardo and Roberto Riojas begin discussing obtaining a quantity of marijuana once again for distribution to the persons in Michigan.  This time the individual with whom everyone is dealing with is Juan Gutierrez.

Ricardo Riojas informs Lilia Riojas he is meeting with Juan from Michigan.  Riojas also talks to Roberto Ramos on January 18 about Riojas coming to Michigan.

On January 23, Ricardo Riojas updates Roberto Riojas on the trip to Michigan, and on that same day discusses with Bobby Rosa a meeting at which they are to discuss an upcoming shipment of marijuana.

Once again, on February 13, Riojas advises Juan Gutierrez that it should be a few more days because they are now lining up the drivers.  Following this conversation, Ricardo Riojas does make arrangements with another co-conspirator, Felipe Gonzalez, Jr., to transport the marijuana to Detroit, Michigan.

As a result of the continued wire interception and the surveillance by law enforcement officers, approximately 320 pounds of marijuana is seized that is destined for the Detroit customers, was seized on February 20, 1996, in Mission, Texas.

On March 13, 1996, Rene – following these particular– after this particular seizure of marijuana, a court authorizes a wire interception on the residence telephone of Rene and Yvette Gonzalez.

On March 13, 1996, Rene Gonzalez, pursuant to the wire interception, instructs Maurice Gordon to travel to the Dallas, Texas area, but to take a circuitous route.

Federal and other law enforcement officers observed Gordon travel by airplane to Oklahoma City, where he then rents a vehicle and drives it to Garland, Texas.

Subsequently, on March 15, 1996, Gordon is arrested while transporting 160 pounds of marijuana.  Prior to the actual seizure of the marijuana, Rene Gonzalez is intercepted discussing the distribution of marijuana with another individual, Roberto Ramos.

Gordon, after his arrest, contacts Maida Mascorro for her to contact Rene Gonzalez to get him out of jail.  On March 15, 1996, Mascorro telephones Mike Mascorro. Mascorro knows that Maurice Gordon works for the marijuana trafficking organization.  He then telephones Rene Gonzalez to tell Rene Gonzalez that Maida is calling, is everything all right.

Later that day, Maida Mascorro tells Rene Gonzalez that they got him, and for Rene Gonzalez to call her from a number at which they can talk.

Also during the same time frame, there are discussions on the wire interception in which Yvette Gonzalez advises Rene Gonzalez that she is still looking for an attorney for Maurice Gordon.

During these events, Rene Gonzalez, who is with Mike Mascorro a great deal of time, saying that they— also indicates that he is also trying to track down a lawyer, and to have the lawyer call him at Mike Mascorro's home.

At 8:13 that day, Gonzalez talks to Maida Mascorro, who says that Mike is trying to get hold of him and that it will be Monday.  Rene Gonzalez instructs Maida to tell Maurice that he should not tell them anything, that Mike says Monday he will be out without a doubt, Mike explained it and it will be fixed.

She asked probation or something, and Rene responds, yes, it will not cost you anything.  Maida responds, it does not matter, it is business.  Rene Gonzalez goes on to tell her to tell Maurice, tell him not to ruin me.  Just chill.  The lawyer will be over on Monday.

On March 16, Mike Mascorro places a call from Rene Gonzalez' home to Maida Mascorro.  He tells her that Rene Gonzalez is going to pay the $8,500, the 10 percent to the bond man, but you need to sign the papers even though Rene is putting up the money.

On March 17, that same day, Rene calls, Rene Gonzalez calls Yvette Gonzalez and tells her that he is still at Mike Mascorro's and they are trying to get the idiot out.

Mike Mascorro calls Maida Mascorro and tells her that she will have to get all the documents, including those from the appraisal district, and you must still sign the papers.

Mike Mascorro also tells Maida Mascorro, we need to get Maurice out.  There is simply no other way.  Mike Mascorro continues to tell Maida that Rene Gonzalez said he would get the $8500 for you to go over there to get him out.

On March 17, 1996, Candy Mascorro speaks to her husband, who is at Rene Gonzalez' home.  Mike Mascorro proceeds to tell her that he and Rene Gonzalez are going to a particular attorney to give him money for him to go over there to get Maurice Gordon out.

On March 17, Mike Mascorro, masquerading as Rene Gonzalez, calls a bail bond company and discusses with them the terms of getting Maurice Gordon out on bond.

They tell–Mascorro tells the bail bond company that they have the $8500 in cash but that it would be difficult to come up with the additional $4,250.

Mascorro, utilizing the name Rene Gonzalez, once again calls the bail bond company and tells them they will be wiring this money from a bank in Dallas to her account in Edinburg, Texas.

This does not occur.  However, on March 18, 1996, agents observe Mike Mascorro and Rene Gonzalez arrive at the bail bond company together, where they remain inside for 20 minutes.

Rene Gonzalez, prior to that occasion, had delivered, according to the records of the bail bond company, $7200 United States currency to a representative of the bail bond company, which was used to secure Maurice Gordon's release on March 20, 1995.

The rest of this also relates, your Honor, to the money laundering, the continuation of the money laundering conspiracy, and also properties 30 and 29, which are subject to forfeiture, so I need to lay the basis of fact for that.

***

On April 15, 1991, Pedro Moreno and Ricardo Riojas purchased approximately 185 acres of property which is known as the Coyote Ranch for $74,000 in U.S. currency, which represents proceeds from drug trafficking.

In order to conceal their ownership of the property, the Coyote Ranch was titled in the names of three different nominees at three different times.  The persons in whose name the property is titled include Rodolfo Garcia, the defendant Yvette Riojas Gonzalez, and Maria Hilda Munoz.

The first nominee, Rodolfo Garcia, also participated in the marijuana enterprise. Additionally, Ricardo Moreno and Pedro Moreno further concealed their ownership of the property by not filing the deeds in the county records for the initial purchase of the property.

On May 15, 1992, a warranty [deed] was filed in the county records which stated that the property was sold to Irela Yvette Gonzalez on April 29, 1992.

However, Pedro and Melba Moreno solicited Yvette Gonzalez in order to conceal their ownership to participate in the sham transaction in which no money or anything of value changed hands.  This effectively concealed the ownership of Pedro and Melba Moreno, as well as Ricardo Riojas, to sell this property.

Yvette Gonzalez is the daughter of Lilia and Ricardo Riojas.  She is the sister of Melba Moreno and the sister-in-law of Pedro Moreno, co-defendants in this case.

20

Ricardo Riojas and Pedro Moreno utilized this property as a place in which they stored, wrapped, weighed and loaded marijuana into vehicles prior to its distribution.

On June 28, 1996, another deed, a warranty deed is filed with the county records. This deed purports to show that once again Yvette Gonzalez sells the property to an individual, Maria Hilda Munoz, for $10 and other valuable consideration.

Once again this transaction was a sham and was designed to conceal, Pete, Melba Moreno and Ricardo Riojas's ownership, as well as a source of funds which had been used to initially purchase the property.

A meeting was subsequently held at the residence of Pedro and Melba Moreno where a plan was concocted to mislead authorities as to the ownership of the Coyote Ranch. A detailed scheme formulated by Pedro Moreno and Melba Moreno and participated in by Maria Hilda Munoz and Irela Yvette Gonzalez called for Yvette Gonzalez and Hilda Moreno– excuse me, Hilda Munoz, to claim that Yvette had sold the Coyote Ranch property to Munoz, even though no sale had taken place, should either of them be contacted by federal authorities.  Munoz was contacted by federal authorities and she relayed to them this fictitious scheme to cover up the sham transaction.

As to Property No. 29, which is the residence of Rene Gonzalez and the defendant Yvette Gonzalez, according to records of Starr County, a warranty deed indicates this property was purchased by Ricardo Riojas and Lilia Riojas in May of 1984.

A promissory note was on the property and it was – a release of lien was entered on May 6, 1985. The purchase price of the property was initially $2,008.75.

The property owner stated that the property, which consists of 2.31 acres, was purchased with United States currency, and at the time of the purchase had no improvements.  It was strictly a lot.

The U.S. currency used to purchase the properties was proceeds from Ricardo and Lilia Riojas's involvement in drug trafficking activities.  Starr County Appraisal District records also show since the property has been purchased, improvements were added which valued at approximately $51,000.

Rene Gonzalez was a son-in-law for Ricardo Riojas, and Irela Yvette Gonzalez, who is the daughter of Ricardo Riojas, resided on this property and this is the place from which Rene Gonzalez also, as well as his wife, would utilize the telephone at that location to discuss marijuana trafficking activities, as well as money laundering activities, which resulted in the seizure of marijuana, as well as U.S. currency from co-defendant Maurice Gordon.

\*\*\*

The Court: Okay. All right. Same question to you, Mr. Gonzalez. What was your involvement in these two conspiracies?

The Defendant: I was involved in the conspiracy to deal in drugs. And basically I was working for my father-in-law, giving messages.

The Court: Again, Ms. Lombardino gave us quite a bit of detail about what she feels like she can prove in the case. Do you have any quarrel with what—

The Defendant: Well, the only thing I could say is I was really not like supervising anybody. I mean, I was just giving messages for my father-in-law. He would tell me to call him and tell him to go over there and do that, and that is it. It makes it look like I was the one actually doing the deals and stuff. That's it.

The Court: Well, but regardless of the spin perhaps that you would like to put on it—

The Defendant: I understand.

The Court: The facts that she was relating, those facts—

The Defendant: Oh, yes, ma'am. They are–the only thing that I heard there wasn't right was that we were looking for a lawyer for Maurice. We never did look for a lawyer, we were looking for a bondsman everywhere. The attorney– we never came up with no attorney.

Ms. Lombardino: I don't think they hired the lawyer but they did discuss it on the wire, getting one, and they were looking for the lawyer, just to make that clear.

The Defendant: No. I think Maurice, after he got out of jail, he went and looked for–talked to Mr. Izaguirre from McAllen but the man was too expensive.

Ms. Lombardino: I wasn't trying to say they hired a lawyer. They just, from the wire, they were discussing– let me just clear up what it is and maybe he may agree with it.

But they were discussing on the wire if they were looking for the lawyer, even placed phone calls, I do know that, to a lawyer's office. However, they did not end up hiring the lawyer that Mr. Gordon did use in his state court proceedings. Okay?

The Defendant: Yes, ma'am.

\*\*\*

22

Yes, ma'am.  That is true.

The Court: How about the money laundering?

The Defendant: The money laundering is true, ma'am.  I went and tried to spring him out.  I delivered the amount of money she said.  I gave it to a guy there in Roma in a parking lot.  He came over and I signed a receipt.  I gave him the money.

I think it was two parts, though.  I gave him one part and then another part. (Document No. 4974, pp. 9-24, 27-44, 46-48).

Prior to sentencing, a Pre-sentence Investigation Report ("PSR") was prepared (Document No. 4684, Addendum to PSR, Document No. 4717), to which Gonzalez filed written objections.[4] (Document No.4648).  Pursuant to the PSR, Gonzalez' sentence was calculated as follows:  (1) In calculating Gonzalez' base offense level, because Gonzalez was held accountable for 2,853 kilograms of marijuana, U.S.S.G. § 2D1.1 directed a base offense 32.    (2) Because Gonzalez was a manager/supervisor of a criminal  activity that involved over five criminal participants, his offense level was adjusted upward by three levels pursuant to U.S.S.G. § 3B1.1(b).  (3) Because Gonzalez unlawfully influenced a co-conspirator with the intent to obstruct justice during the investigative phase and at the sentencing phase in the state case, his offense level was adjusted upward by two levels pursuant to U.S.S.G.   § 3C1.1.  (4)  With an adjusted base offense level of 37, and with a

---

[4] Gonzalez objected to information relating to relevant conduct, ¶¶ 9, 20, 22, and 54.  In addition, Gonzalez objected to the three level adjustment based on his role as a manager/supervisor. Gonzalez denied that he was a manager or supervisor.  Also, Gonzalez objected to not being given a two level downward adjustment pursuant to U.S.S.G. § 2D1.1(b)(b) and U.S.S.G. § 5C1.2. According to Gonzalez, because he met all the criteria for the "safety valve" he should have been given the adjustment.  Finally, because Gonzalez fully accepted responsibility for his actions, he objected to the absence of an adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a).  According to Gonzalez, his sentencing range should be 70 to 87 months.  (Document No. 4648).

criminal history of category 1, Gonzalez had a guideline range of 210 to 262 months.  (Document Nos. 4238, 4717).

Gonzalez was sentenced on March 15, 2002.  (Document No. 4729, Transcript of Sentencing Hearing, Document No. 4817).  The record shows that Judge Harmon considered and  rejected all of Gonzalez' objections to the PSR, as follows:

> The Court: Mr. Gonzalez, have you had a chance to read over the presentence report that has been filed in this case?
>
> The Defendant: Yes, ma'am.
>
> The Court: Have you spoken with your attorney, Mr. Ramirez, about it?
>
> The Defendant: Yes, ma'am.
>
> The Court: Do you feel like you understand everything in the report?
>
> The Defendant: Yes, ma'am.
>
> The Court: Do you have any questions that you'd like to ask about it at this time?
>
> The Defendant: Like what, your Honor?  Like what kind of questions?
>
> The Court: Well, I mean, just questions such as– just to clarify something that maybe you didn't understand completely.
>
> The Defendant: No, I understand.
>
> The Court: Yeah. Okay.  All right.
>
> Now, Mr. Ramirez has filed some objections to the report and I'm going to go over those in just a minute, but I want to find out from you whether you have any objections to the report that you'd like to tell me about that Mr. Ramirez hasn't filed.
>
> The Defendant: Well, I wanted to say about the acceptance of responsibility, your Honor.  They're saying that I didn't accept responsibility when I admitted to a Level 32 which carried 2200 pounds to 6600 pounds.  My PSI came back with 5,000 pounds and it falls within that category.

You know, the only think that I didn't do was elaborate on it, you know. I didn't give details about them or anything, but I am responsible for that. But I don't know— that's all I wanted to say.

The Court: Yeah. Okay.

The Defendant: I take full responsibility for whatever— for those pounds; you know; but I just didn't give any details about them; and I'm not sure if – I didn't want a 5K, your Honor. You know, I didn't want to put my family in any kind of risk or anything, you know, somebody retaliate against them or anything, you know, because I know whatever I say to the agents or whatever I say to the probation office, they'll use it in other people PSIs to raise their levels; and then, they'll know that it was me, you know; and I don't want anything to happen to my family.

The Court: Okay.

The Defendant: That's why I didn't elaborate, but I did accept, your Honor. That's why I pled guilty to an minimum of ten years, you know. That's a lot of time. You know, I never spent any time in jail. I didn't just, you know, overnight said, "Yeah. I'm going to plead guilty to ten years of my life" because I knew that it carries — you know, I was getting responsibility for 2200 pounds to 6000 pounds at least, you know, ten years; and I accepted that. Like I said, I didn't elaborate on them, but I did accept those pounds. That's it.

The Court: Okay. I think Mr. Ramirez has made an objection to your not receiving acceptance of responsibility, and I'm going to let Ms. Lombardino respond to that when we get there. Is there anything else?

The Defendant: Also, the manager, supervisory role, your Honor. I merely was a messenger, your Honor. I merely made some – I gave some messages out for the old man. That's all I did. I don't know–

Mr. Ramirez: I think I objected to that also.

The Court: I think Mr. Ramirez objected to that, too.

The Defendant: Other than the objections?

The Court: Yeah.

The Defendant: Okay.

25

The Court; I was just trying to find out if there were any objections that Mr. Ramirez didn't make.

The Defendant: Yes.  They put five kilos of cocaine in my PSI, your Honor; and they said I was – Eutiquio Guerrero had sold me half a kilo less than – on less then ten occasions.  But yet, on the fact at the end, they multiply it half a kilo times ten when it said less than ten.  They didn't mention it was one time, two times, or three times, you know.

The fact is that it was one time, that I can remember for sure was one time that I bought half a kilo.  And the PSI says that I'm responsible for at least – no, on less than ten occasions I had bought half a kilo from Guerrero; but it doesn't say how many, ten, three, one.  You know, less than ten occasions could be any number.  But yet, they multiplied ten times half and stuck me with a thousand pounds.

The Court: What is that, Ms. Lombardino?

Ms. Lombardino: I'm trying to find it.

Mr. Ramirez: I think it's towards the end of the relevant conduct part.

Ms. Lombardino: 54 is where I – where I see that there's a total amount.  I'm trying to find out what was said in the PSR itself.

The Court: Oh, I see.  I see what he's saying.  He said five kilograms of cocaine which is a total marijuana equivalency of – well–

The Defendant: No, no, no.  It's not that one.  It's over here, your Honor.  It's over here where it says— its says specifically that — I don't know if it's Eutiquito Guerrero who's saying or who's saying, but that's wrong.  Let me find it.

The Probation Officer: Your Honor, it's in paragraph 34 of the PSR.

The Defendant: 34?

The Court: 34.

The Probation Officer: And your Honor, I think I can speak to that.

***

Yes, your Honor.  According to the debriefings, as I recall, the information was that on less than ten occasions it was half a kilo and on one occasion it was a full kilo.

26

We tried to take the conservative approach and do a half a kilo on all occasions and came up with an estimated quantity of five.

The Court: Okay.

The Defendant: Your Honor, it's not true, your Honor. My god, it's not true. It's not true. It's not true. I swear to god it's not true.

The Court: Wait. It's not true that you dealt in cocaine or it's not true—

The Defendant: No, no. It's true I accepted at least half a kilo. That's true. That is true. But not five kilograms, your Honor.

The Court: So, just on one occasion—

The Defendant: No. It was two occasions.

The Court: Two occasions?

The Defendant: Yes.

The Court: So, it was one kilo?

The Defendant: It was one and half. First, he brought me one kilo, and then he had given another kilo to somebody else and he couldn't sell it. And it wasn't half a kilo, it was 11 ounces. The second one he brought me was 11 ounces of cocaine, not half a kilo because half a kilo is 18, I think.

It was a kilo first; and then, that guy he gave the other kilo to couldn't sell it. So, he brought it back. He brought it to me, half a kilo. It was 11 ounces actually. So, it was a kilo and 11 ounces within a three-month period.

***

–on this confidential informant, which I know who he is, he says here that I send him and that I instructed him to go to Detroit, Michigan. That guy brought his cousin to talk with my father-in-law, your Honor. They went and talked to my father-in-law to by-pass their other cousin that was selling to that other guy from Detroit.

They by-passed him because he was making too much money. So, they found out that Ricardo was taking, you know, the drugs to him by that other cousin. So, he came–he asked me that – if I knew Poncho was grabbing stuff from from mi suegro, from my father-in-law. So, they come and ask me– they asked me what I can do for

them so they can by-pass the other cousin that was making $150 a pound, and his name is Max Gutierrez, and I told the agents that.

They come and talk to my father-in-law.  So, my father-in-law arranges, "Okay, we're going to work" and I'm going to give Godfrey," the CI.  "I'm going to give him $5,000 a trip.  That's what he told him.  So, guess what?  Godfrey tells my father-in-law, "well, you know what?  I need some money up front."

Next thing I know, my father-in-law comes and tells me that Godfrey is in Detroit, Michigan.  I didn't tell him to go nowhere.  I didn't instruct him to do nothing.  He left over there by himself to make sure that he would get his cut.  That's why he went over there and stayed with his cousin.  But I never send him nowhere.  That's not true.

The Court: Okay.  All right.  Any other objections that Mr. Ramirez hasn't made for you?

The Defendant: Yes, ma'am.  There is another one.

The Court: Okay.

The Defendant: Mr. Stanley Saucedo, he mentions me and some other people that are not indicted on — I don't have know what paragraph.  It's 300 and some pounds.  I have no involvement in that.  I don't even know what he's saying.  In the other ones, he said 150 pounds.  That's true.  That's true with the fact that I told them that I might know somebody who had.

And I told him, "Look, call these people and they might have some."  And he did go get them and he never paid them.  He never paid them.  But that is true.  That is true.  But the other 300 pounds, they're talking about North Carolina and a whole bunch of people.  I don't even know anything about that.  That's the fact.  I swear to God that's the fact.  I don't know nothing about those 300 pounds.

Also, another 300 pounds involving the Rosa brothers in McAllen.  My father-in-law mentions to somebody over there in Detroit, I think, Roberto Ramos, he says that — Roberto Ramos asks him if I knew about the load; and he goes, "Well, he's helping out."

But that was not true, your Honor, because they were doing it behind my back.  You see, he told Roberto Ramos that he did know that I was helping out because he didn't want for Roberto to know that he was going behind my back.  He thought that Roberto Ramos would not grab the marijuana if he knew that I did not know.

28

But I did not know about that weed.  I never knew about it.  Not until I'm arrested and I see my counts, and Robert Rosa and all those people are in there.  I go talk to them in Conroe and ask them, "What's this?"  And then, they tell me the story that they got caught in McAllen and some other stuff.  I didn't even know about it.  I swear I didn't even know about it.

And they still charge it to me.  In sum here it says, ba, ba, ba, ba.  They're mentioning my father-in-law for everything.  And then, at the end they just put "And Rene assisted."  But your Honor, I did not assist.  Or "Rene helped."  I did not help.  Not in that, your Honor.  I swear I did not help in that.

The Court: Anything else?

The Defendant: No.  That pretty much covers it.

The Court: Okay.  All right.  Let's — the Government has objected to the PSR because it did not reflect a 2-level upward adjustment for obstruction of justice, and the probation officer in the addendum has agreed with that.

It there anything further anybody would like to say about that?

***

Mr. Ramirez: I was shocked when I saw that addendum by the presentence– by the probation officer because, Judge, it appears to me from what's in the objection and what's in the addendum is that they're taxing Mr. Gonzalez, asking that he be held accountable for obstruction for something that somebody else did, that Mr. Maurice Gordon was sentenced– and I'm assuming that this is a state charge that he was sentenced on.

I don't believe we have a transcript of that.  The statement in the objection is that he did not implicate Mr. Gonzalez when he was sentenced in that state court.  Well, number one, we don't know whether he was ever asked about Mr. Gonzalez there, and we don't know whether or not Mr. Gonzalez was involved in that particular load either.

So, I think it's really reaching to hold Mr. Gonzalez responsible for obstruction of justice based on what somebody else does.  Now, there's the implication that Mr. Gonzalez and Mr. Gordon had an agreement not to give information on each other, but that is, basically, an implication, and that is not specifically tied into this particular sentencing that Mr. Gordon had in state court.

And Judge, Mr. Gonzalez is already looking at an appreciable amount of time for his involvement in this conspiracy, and I really think it's really piling on here in view of his involvement in this conspiracy, in view of the level that he's at with reference to all the other Defendants to now and try and add more points for obstruction of something that somebody else did.

If Mr. Gonzalez had done something to obstruct justice, then I can understand that; but they are stating that Mr. Gordon didn't mention his name so somehow that makes Mr. Gonzalez responsible for obstruction; and I disagree, Judge; and I do think that it would be a miscarriage of justice to add on points for something Mr. Gordon did on Mr. Gonzalez.

\*\*\*

The Defendant: Your Honor, I read the PSR report about that.  Maurice Gordon, he was – he made a deal with some other Mexican guy.  I was there.  He made a deal with some Mexican guy.  His name is Felix Mendoza.  He made a deal with him that he would do that because my father-in-law was dirty enough to shoot us and do all kinds of stuff to us, burn his house down and all this crap.

So, he wanted to make some money back to pay the old man so he could get him off his back because he couldn't sleep.  And he asked me to talk to that guy that had approached him before.  He had already approached him before.  And he asked me if I could find him and see if he had a job for him or something.  And he did.

And I took him and he talked to the man and they got together on the information and everything, and they got together, and he said he was going to transport the stuff for him.  Okay.  I knew about it.  Yes, I knew about it.  I knew about it, and I take responsibility for that.  But I did not – the marijuana was not mine, you know, so I couldn't tell him "Don't say nothing."  I never told him "Don't say anything or nothing," your Honor, never.

The Court: Ms. Lombardino, response?

Ms. Lombardino: Oh, yes.  First of all, for Mr. Gonzalez to stand here and tell this Court that this explanation he just gave is completely refuted not only by the — about his involvement with Maurice Gordon on that last marijuana load during a court-authorized wire interception of his home, not Ricardo Riojas's home but Rene Gonzalez's home, and to sit here and tell this Court that, you know, he's — which he typically does, is that he's not really involved in all of this, this is something that all these other people did, but he knew about it, but he knew about it, well, the wire tap conversations certainly that are relayed in the PSR completely refute that.

30

And if the Court wasn't going to give him obstruction of justice based on what happened involving Maurice Gordon at a trial when he was arrested and then put on trial for the very marijuana we're talking about here, then, this should constitute obstruction of justice, if nothing else.

But that aside, it would appear to me that the PSR— the addendum to the PSR is absolutely correct. It was part of the agreement that they had. Maurice Gordon was going to be let out on bond. This man got on the phone, tried to find attorneys for Maurice Gordon, made arrangements to get him out on bond with the complete understanding– not even understanding, stated understanding, that "Don't ruin me over all of this" so that he could keep quiet about Rene Gonzalez's involvement in this episode.

It was part of their agreement, had always been part of their agreement, and that is the agreement that they had. And keeping with that agreement, Mr. Gordon kept up his part of the bargain. Now, for that reason, he is held accountable under the law for obstruction of justice and should be awarded that.

In addition, your Honor, like I just pointed out, what he just said here today – in fact, what he said pretty much through his explanations, I think in addition to that, one thing I also noticed while I was reading the PSR is that in Paragraph 73 when the probation department declines to give him acceptance of responsibility initially, they point out that the Defendant provided false information in his affidavit.

We're not talking about not going into details as he has portrayed to the court here today. We're talking about out and out falsehoods. For example, you know, in September, 1995, the Defendant was directly involved in his first marijuana transaction. I mean, the PSR completely refutes and his own comments completely refute that that is a true statement.

And this is not about him omitting things about other people in his acceptance of responsibility statement, it's about him lying about his conduct. Because they're not interested– the probation department is not really interested in exactly what everybody else did when you're talking about acceptance responsibility, it's interested in what Mr. Gonzalez did.

And the probation department itself also went on to say, "He greatly minimizes his participation in the events." Doesn't talk about that he didn't mention all his other little drug trafficking business. It talks about he minimized his participation in these events.

And those— that conduct by itself also, even though it's not reflected in the PSR, would constitute obstruction of justice under 3C1.1 because he provided materially

31

false information to a probation officer during the course of a PSR investigation with the intent to influence that PSR investigation to give him acceptance of responsibility.

So, his conduct today, in addition, – and his conduct when he gave his statement, in addition to the obstruction of justice reasons which are set forth in the addendum, all are sufficient to award him obstruction of justice here today.

Mr. Ramirez: Judge, you know, whether or not he fully accepted responsibility is something that the Court has to decide based on what the probation officer has represented in the report.  What I am arguing is that he should not be taxed with a 3-level upward adjustment for obstruction of justice based on –

The Court: Two levels.

Mr. Ramirez:  — a 2-level obstruction of justice based on a statement – a blank statement that Maurice Gordon did not reveal his identity in a state sentencing because we don't have any information.  In a state sentencing, as this Court well knows, you're not asked to provide information on other people most of the time.  You are sentenced based on your plea and that's it.

So, without a transcript, without any evidence to present to this Court what Maurice Gordon took any steps to hide his involvement, then, that's a bogus argument, Judge because there is no evidence before this Court that Maurice Gordon did that.  That's a blanket statement.   That's speculation, which, basically, half of this PSR is speculation, to be honest with the Court.

If the Court has read – I know the Court has read the PSR.  Half of it is speculative.  They speculate 50 pounds per week for a year.  Now, they don't say where they got that information.  They don't say how they come up with those figures.  But we're not arguing that because we know Mr. Gonzalez is facing a 10-year minimum.

He didn't safety valve and he didn't 5K.  But then to ask that he be sentenced – instead of ten years that he be sentenced at 17 years, what Mr. Gonzalez was, Judge Harmon, was a glorified gofer in this organization.  And I think Ms. Lombardino knows that.  I think everybody else knows that.

If Mr. Gonzalez was as high up in this hierarchy as they are saying, then where is the property that he accumulated?  Where are the vehicles?  Where is the jewelry?  Where are the vacations that the Morenos and the Riojas took?  Mr. Gonzalez accumulated  no property.  He owns nothing.  He never has owned anything.  He owned one pick-up truck.  That's all he had to his name.

What he was was a glorified gofer working for his father-in-law; and to upward adjust this man to 17 and half years, as the probation officer wants this Court to do and as the Government wants this Court to do, that is a miscarriage of justice.

Ten years in prison fits the crime here.  That fits what Mr. Gonzalez has done, not 17 years, Judge.  And we're asking the Court to sentence him at the mandatory minimum, which would be ten years.

\*\*\*

Ms. Lombardino: May I just respond for a moment?  I mean, I don't believe that the determination is that he should get ten years here.  The question is a matter of law and fact whether obstruction of justice should apply, and that's – so, I just would ask the Court not to consider that sort of argument on this; and we believe that the PSR has demonstrated– and it's not just a whim.

I mean, the probation office has done a thorough investigation.  It's interviewed the people that have, you know, been involved to determine that this – it did happen. He's just coming in here and saying it didn't, but he has no basis to say– if you want to talk about speculation, that's the speculation.

The Court: Well, I think that Paragraph 52 is based upon credible evidence, certainly can find by a preponderance of evidence that Mr. Gonzalez obstructed justice.  So, I am going to sustain the Government's objection to Paragraph 71 and give Mr. Gonzalez a 2-level upward adjustment for obstruction of justice.

Now, the next objection is by the Defendant and that has to do with the money laundering, $61,000.

Mr. Ramirez: Yes, Judge.  And I did file those objections, but I would represent to the Court that even if the Court were to adopt those objections, we still fall at the same level.  We still fall at a base level of 32.

The Court: All right.

Mr. Ramirez: So, for the record, I am urging those objections, but I would represent to the Court that they wouldn't change the base offense level even if the court adopted them.

The Court: Well, I'm going to overrule your objection to Paragraph 9.

Next objection is to Paragraph 20.  It has to do with 1200 pounds of marijuana transported to Detroit, Michigan, from 1993, 1994.

Mr. Ramirez: And once again, Judge, that is the – that is the paragraph wherein there is an estimation of 50 pounds of marijuana every two weeks for approximately one year which are supplied by Ricardo Riojas and assisted by Rene Gonzalez, and I just don't see– that's speculation.  That is speculation.  I don't see anything in the PSR that would reflect actual trips every two weeks with 50 pounds.  And – but by the same token, Judge, that would not change the base offense level.

The Court: Of course, the sentencing guidelines allow for estimation when there is no drug seizure, and I think there is sufficient credible evidence to find from the – as the probation officer says, from the IRS CI and credible and reliable co-conspirators that this was done.  So, I'm going to overrule your objection to Paragraph 20.

Now, the objection to Paragraph 22 has to do with laundering $310,000, conspiracy to possess with intent to distribute 545 pounds of marijuana between June 5, 1995, and September 6, 1995.

Mr. Ramirez: Yes.  And of course, upon reading that paragraph, Judge, the word "usually" is used several times.  These are based on airline records wherein Maurice Gordon went to Detroit.  And so, every time Maurice Gordon would go to Detroit, the probation office and the Government, therefore, linked the trip to Detroit to Rene Gonzalez and his participation in a drug transaction without any concrete evidence to back up or support that speculation, Judge.

And it's just — it's based on airline records and average amount of money that is picked up and then calculated and added up together and attributed to Rene Gonzalez on relevant conduct, and it's just – it is speculation.  There is no way you can read that paragraph and not say that they're speculating about the amounts involved and whether or not Rene Gonzalez was involved on each and every one of those trips that Maurice Gordon took to Detroit.

Ms. Lombardino: Your Honor, I would also like to say I believe the Defendant himself has admitted in some statement he gave to the probation department, which is included in here, that there were at least four to five trips in which Maurice Gordon traveled to pick up money.  So, I don't believe that that part is speculation.

In addition, I believe that the probation department has indicated that this wasn't just an estimate.  These were the number of times – they just were using the – I believe they're taking this out of context.  They're using the airline records just to corroborate the information that came from the individuals that provided the information that they actually traveled.

Maurice Gordon actually traveled there on those days and was corroborated by the records.  And the whole point of him traveling there, which was provided to the

probation office, was for him to pick up money; and he had been doing that and he was directed to do that at Rene– Rene Gonzalez was the person who did that, who would tell him when to go, when to pick up; and I believe all that is in the PSR.

So, it's not based on just records alone; and the amounts also come from interviews that the probation department has also conducted that relate to the amounts of money that were attributed on each time, and they generally take the lower figure and use that figure, it's my understanding–Ms. Pope can speak to that differently– in determining whether– you know, the total amount for those trips; and it's just summarized in a paragraph.  That's what is said and that's what is said in the addendum.

The Court: She says– Ms. Pope says in the addendum that "the information in Paragraph 22 was based on debriefings of the cooperating co-conspirator and was corroborated through the airline records, hotel records, and money seizures." So, I'm going to overrule the objection to Paragraph 22.

Paragraph 54 has to do with $757,040 in laundered funds and 2,853 kilograms of marijuana; and that's what Mr. Gonzalez was telling me about earlier, I believe.

***

Mr. Ramirez: That's correct, your Honor.  That's just a global objection based on my previous objections, that the totals should not reflect those–those amounts.

***

The Probation Officer: Well, your Honor, even if the five kilos was deducted and we used the Defendant's amount of 1.5 kilograms, it does not change the offense level.  We got to get under a thousand kilos of marijuana along to get below a level of 32.

The Court: Okay, all right.  Then, I overrule the objection to Paragraph 54.  All Right.  Paragraph 70 is the upward adjustment.

***

Mr. Ramirez; That's the objection we made to labeling him a manager or supervisor, your Honor.

***

35

And Mr. Gonzalez has over and over told people that he did not manage Maurice Gordon or supervise him. He introduced Maurice Gordon to his father-in-law who then managed and supervised Maurice Gordon.

The fact that Mr. Gonzalez participated with Maurice Gordon in some of the transactions does not make him a manager, supervisor; and he certainly never was a manager supervisor of Maurice Gordon.

Ms. Lombardino: Your Honor, it's very clear from the PSR and the wire tap conversations. There is no question that the person directing the activities of Maurice Gordon, just if you just look at the wire tap itself, was Rene Gonzalez and the IRS CI.

What is not noted in the addendum is that he also directed the activities of his wife. If you just look at the — read the synopsis of the wire tap conversations, he also told his wife, Yvette Riojas Gonzalez, what to do, who to call, what to say.

So, in addition to what's here, I believe the Court can look at the PSR itself and also see that he was directing more than one person. He is not some glorified flunky.

The Court: I believe the credible evidence would indicate that Mr. Gonzalez was not a glorified flunky. I'm going to overrule the objection to Paragraph 70.

And then, you object to Paragraph 68 where you were not given the 2-point safety valve.

Mr. Ramirez: I withdraw that objection, your Honor.

The Court: All right. And also object to 73, the acceptance of responsibility.

Mr. Ramirez: Yes. And we will – we will argue that. We do argue that objection, your Honor. Mr. Gonzalez has accepted responsibility for what he did. The fact that he didn't do a safety valve or 5K1 and give more information to the Government, he did begin debriefings. They didn't go well.

But he has accepted responsibility for what he did, what he participated in; and it's my understanding that that is what is required of the statute – by the statute for acceptance of responsibility; and we believe that he has done that and should be given the three points for acceptance.

The Court: Ms. Lombardino?

Ms. Lombardino: I can say as to his debriefings, your Honor, he minimized his own conduct in our debriefing so I don't want that to be left unsaid, and that was one of the reasons why the debriefing did not go well.  In fact, it was only– my recollection is one debriefing that did not go well.

I did not personally participate in that, but I have interviewed the agents who did participate in that, and their assessment was in addition to him not providing information that related to his sources of marijuana, his customers, he completely lied about Eutiquio Guerrero's role in the offense.  He also covered up for Mike Mascorro in his interview with them, and he also did not relay his activities and the activities of his brother Gutoy to the agents.  So, I don't believe that his debriefing does anything to help him in this situation.

Mr. Ramirez; And your Honor, just a brief reply to that.

The Court: Sure.

Mr. Ramirez: I don't think that that is what is required of a person for acceptance. I don't think they have to debrief with agents to get acceptance of responsibility.  So, I don't understand that argument.  He did not debrief.  There is not doubt about that. He did not debrief the way he would have been required to debrief for a 5K1 or a safety valve, but he did tell the probation officer his – he pled guilty to this Court timely, and he did tell the probation officer about his involvement in the offense. Whether or not he gave names or was specific about other people's involvement, I don't believe that is required either for acceptance of responsibility.

Ms. Lombardino: I think you misunderstood.  I'm not saying —I thought you were saying he did all this in his debriefing so, therefore, that should somehow count; and I was just addressing that.  Maybe I misunderstood counsel and all I was trying to do is that did not happen in his debriefing.  I agree with counsel, it's what he tells the probation department.  I'm sorry.  I misunderstood you.

The Court: According to Ms. Pope in her addendum, the defendant has not demonstrated acceptance of responsibility based on the statement provided to the probation office as he minimizes his own involvement and falsely denies relevant conduct.

So–plus, he's – if you have obstruction of justice, it's close to impossible to get acceptance of responsibility.  So, I'm going to have to overrule your objection to Paragraph 73 and deny his acceptance of responsibility.

And finally, you objected to Paragraph 76 which calculates the 35.

37

Mr. Ramirez: Yes, your Honor.

The Court: And I'm overruling that, too, based upon my overruling the other objections. I adopt the presentence report as my own, both the findings of fact and the application of the guidelines to the facts, find a total offense level of 37, criminal history category of I, which gives a guideline provision range of 210 to 262 months.

Anything else before I pronounce sentence?

Mr. Ramirez: Judge, just that I'd ask the Court to – if the Court is adopting that guideline range, to sentence Mr. Gonzalez at the minimum, Judge. I've already told the Court Mr. Gonzalez was not high up in the hierarchy of this organization, and I think everybody understands that. And he did not accumulate any property. He didn't become a millionaire. He didn't even have enough money to buy a house.

To sentence him– as it is, if the court sentences him at the low end, we're talking about 17 and [one] half years of time, and I think that's outrageous for what he did. But obviously, the Court has adopted that finding. I'd ask the Court to at least sentence him at the low end and not in the middle or high end.

***

Judge, this is not– this is not Monopoly, this is not time out. If Ms. Lombardino is representing to this Court that 17 and half years in jail is not a significant amount of time for punishment, then, I think that's a misrepresentation.

Judge, to sentence him at the high end would be to say, "You know what? You are never going to be a member of society again." And he doesn't – maybe the leaders of this organization deserve that, not Mr. Gonzalez. 17 and half years is along time. For those of us who have never been in jail, I don't think we realize how long that is. That is a very long time, Judge.

And we're asking the Court – the Court has adopted the PSI. The Court has overruled all our objections. All we're asking is that the Court sentence him at the low end of the guideline range so that he has an opportunity to serve his time and be with his family again.

That's – he still has along ways to go, Judge, even if the Court gives him the low end. He's been in jail five years, and he'll be looking at another 12 years in prison.

***

38

The Defendant: Yes, your Honor.  I would like to thank my family for all the support I've had for the past five years, and somehow being incarcerated helped me.  I would probably be dead by now.  I was doing too much drugs and too much crazy stuff.

So other than that, your Honor, I apologize for anything, you know, misconduct that I had; and I don't know, your Honor, I'm speechless.  I'm speechless right now.  I never tried to obstruct justice. I never tried to – I don't know.  I don't know.  My mind went blank.

***

I know I broke the law, you Honor; but I don't think I deserve 22 years of my life in jail, your Honor.  I was not – oh, my god.  I know I broke the law, your Honor.  I know I broke the law, your Honor.  But from a level 32, I went up to 22 years?  That's almost tripling of my time.

I don't know.  I'm not as bad as you think I am, your Honor.  I am not.  I swear to God I'm not.  I will just ask for your leniency, I guess, and forgive me.

I love my family.  I wish I could be with them again sometime, some day, and the reason I didn't – you know, it was not that I was trying to protect nobody or anything, I mean, the drug traffickers as Ms. Lombardino said.  I'm not trying to protect the.  I'm trying to protect my family, my boys, my wife, my mother.

It's very easy to come, you know, and mention people and all this.  But what about the consequences to my family?  You see, I'm responsible for my acts, not them.  So I don't want to – why would I want to implicate them in my misconduct?  That's why I didn't say anything, because I fear for their safety, not because I want to protect no drug dealers because nobody protected me.

Everybody put me down the chute, and it's not that.  I swear it's not that.  I was trying– I don't want nothing to happen to my family.  That's it.

Ms. Lombardino: Your Honor, I would just like to point out that his wife testified before this Court in hearings.

The Court: Yes, I remember.

Ms. Lombardino: Or trial, I believe.

The Court: Yes, she did.  She testified at trial.  Well, Mr. Gonzalez, it's not that I think you're a bad person.  I don't think you're a bad person.  And certainly, you know, if it were up to me to forgive you, I certainly do.  It's just that I'm not sure that

you have fully come to grips with what you've done.  And Ms. Lombardino is arguing that you're not going to change even after 17 years in –

The Defendant: I have changed, your Honor–

\*\*\*

–as of– five years, your Honor– I've been incarcerated in a little block for five years, your Honor.  I've had five and half years to think about this every single night.  For five years— five and half more years, that's all I've thought about, and I don't think my kids or my wife or my family deserve what I've done; and I don't– I will never do it, your Honor, for them.  Maybe not for me, as you say, it was only for me.

But for them, I would do anything, your Honor.  I want to be with them again sometimes.  I don't want to go out and my kids be 20 years old.  I swear, your Honor, it's over.  It's over, your Honor.  Even if I have to live under a bridge or anywhere.

I really didn't even have anything out of there.  I didn't.  The house didn't belong to me.  The cars belonged to the GMAC or to the bank.  I never owned no expensive clothes.  I never own nothing.  I never went on trips.  I never – I don't know.  I just don't feel that– the high end of the guidelines, your Honor, it's a life sentence, your Honor.  It's a life sentence, your Honor.

Ms. Lombardino: I hope not.

The Defendant: I'm – 15 years of my life in prison, if that won't change me, 22 years won't change me either.  But I swear to God, your Honor, it's over.  It's over.  You have my word, it's over.  It's over.

The Court: Well, I must say that I hope you won't think that you've bamboozled me with my words–

The Defendant: No, your Honor.

The Court:  – if I say that in this particular situation I think 17 years is enough.  I realize an extra five will keep him off the street.  If he is going to be a recidivist, you know, you would want to do that; but I don't know.  We can't tell.  And I hope that 17 years will change him so that he will not go back into the business.  (Document No. 4817, pp. 3-30, 33-37).

The Court sentenced Gonzalez to concurrent terms of 210 months on counts 1 and 5, to be followed by a five year term of supervised release on count 1 and three year term of supervised release on count 5, with the terms of supervised release to be served concurrent. Also, the Court imposed a special assessment of $200, and one hundred hours of community service. (Document No. 4729, Transcript of Sentencing Hearing, Document No. 4817, pp. 37-39). Judgment was entered on March 25, 2002 . (Document No. 4737).

Gonzalez appealed his conviction and sentence to the Fifth Circuit Court of Appeals. Gonzalez challenged his guilty plea on the ground that there was not a sufficient factual basis to support the drug quantity on which is sentence was based. The Fifth Circuit affirmed his convictions on April 3, 2003. (Document Nos. 5128, 5129). In affirming Gonzalez' convictions and sentence, the Fifth Circuit wrote:

> Gonzalez challenges his guilty plea to the marijuana charge on the ground that the factual basis was not sufficient to establish his involvement with the drug quantity on which his sentence was based. Gonzalez argues that his unconditional guilty plea and his waiver of the right to appeal his sentence do not preclude his challenge to an illegal sentence.

> We review a challenge to an appeal waiver *de novo*. *United States v. Baymon*, 312 F.3d 725, 727 (5th Cir. 2002). A defendant may waive his statutory right to appeal as part of a valid plea agreement if the waiver is knowing and voluntary. *United States v. Robinson*, 187 F.3d 516, 517 (5th Cir. 1999).

> Gonzalez waived "the right to appeal the sentence or the manner in which it was determined or on any ground whatsoever." The agreement made no promise regarding the length of the sentence and stated that the sentence was to be "imposed within the discretion of the sentencing judge." The agreement provided that even if the district court imposed the maximum sentence established by statute, Gonzalez would not, for that reason alone, seek to withdraw his plea or pursue an appeal.

> The district court ascertained at the rearraignment that Gonzalez understood the charges, the potential penalty he faced, and the terms of the appeal waiver. Gonzalez's sentence was within the applicable guideline range and was not in

violation of law.  *United States v. Kirk*, 111 F.3d 390, 393 (5th Cir. 1997).  The record shows that Gonzalez knowingly and voluntarily waived the right to appeal his sentence.  *Robinson*, 187 F.3d at 517.  Accordingly, Gonzalez's appeal of the sentencing is dismissed.  *Baymon*, 312 f.3d at 729-30.

Because Gonzalez did not challenge the factual basis for the plea in the district court, our review of his challenge to the factual basis is for plain error only.  *United States v. Vonn*, 122 S.Ct. 1043, 1046 (2002).  Plain error review requires Gonzalez to show that there is a clear and obvious error that affects his substantial rights.  *United States v. Marek*, 238 F.3d 310, 315 (5th cir. 2001) (*en banc*).

The presentence report ("PSR") established Gonzalez's involvement with over 1,000 kilograms of marijuana, and Gonzalez has provided no evidence to rebut the information in the PSR.  *United States v. Vital*, 68 f.3d 114, 120 (5th cir. 1995).  At sentencing, Gonzalez conceded involvement with 5,000 pounds of marijuana. Gonzalez has not shown error, much less plain error, concerning the sufficiency of the factual basis.  *Marek*, 238 F.3d at 315.  Gonzalez's convictions are affirmed. (Document No. 5129).

Because Gonzalez did not file a petition for writ of certiorari with the United States Supreme Court, his conviction became final upon the expiration of the deadline to file such a petition, or July 1, 2003.  On April 1, 2004, within one year of his conviction being final, Gonzalez timely filed a § 2255 Motion to Vacate, Set Aside, or Correct Sentence. (Document No.5299).  Thereafter, on June 8, 2004, Gonzalez filed a Memorandum in Support.  (Document No. 5363).  In his § 2255 motion, Gonzalez alleged:

Ground One: Whether defense trial counsel's erroneous advice and the government's alleged promise of a sentence of 10 years imprisonment induced Gonzalez to unknowingly and involuntarily plead guilty.

Ground Two: Whether defense trial counsel's failure to properly argue sentencing issues deprived Gonzalez of effective assistance of counsel and a less harsh sentence?

Ground Three: Whether Gonzalez was denied due process when the Court allegedly ordered the U.S. Attorney's office to prepare the factual summaries to be used by the Probation Office in preparing the PSR?  (Document No. 5299).

Gonzalez, in his Memorandum of Law, amplified his earlier issues as follows:

42

Whether trial counsel's explanation of the consequences of the Plea Agreement, erroneously induced Gonzalez to plead guilty, therein depriving Gonzalez of effective assistance of counsel?

Whether trial counsel was constitutionally ineffective for failing to challenge the sufficiency of the Indictment?

Whether Gonzalez was denied due process when the Court ordered the U.S. Attorney's Office to prepare the factual summaries to be used by the Probation Office in preparing the PSR?

Whether sentencing counsel's failure to: (a) raise the issue of the prosecutor's promise; (b) raise the issue of improper preparation of the PSR; and (c) properly challenge the amount of marijuana attributed to Gonzalez; deprived Gonzalez of effective assistance of counsel at sentencing and a less harsh sentence. (Document No. 5363).

In support of his claims, Gonzalez submitted his sworn affidavit, in which he states in

pertinent part:

(1) Agreement to Plea[] of guilty: I was lured into pleading guilty by the AUSA Lombardino, in April of 1998, by her promise to my attorney Mr. Ramirez, that my sentence would be **No more** than 10 [years], and that the government would be somewhat more lenient on my wife Y[v]ette, if I plead guilty to drug and money quantities equating to 460 pounds of marijuana. Based on her promise, I agreed to plead guilty and waive my right to trial. In [January] and February of 2001, the Moreno's (co-defendant's) received their (PSI's) which revealed the government and probation department's intention [to] renege on their [agreements] to sentence them from 10-20 [years], and instead sentence them to life in prison. Learning of the breach of [agreement] with the Moreno's, caused me to immediately ask Mr. Ramirez, to file a motion to withdraw my plea agreement based on the government's bad faith and breach of the agreement with co-defendant's. Mr. Ramirez, refused saying it would be futile because others had tried and failed and he did not want to upset the government. Mr. Ramirez, had no alternative plan to insure that my agreement with the government would not be subsequently be broken, to serve no more [than] 10 [years]. Mr. Ramirez, stood moot [sic] at sentencing while AUSA Lombardino breached our no more than 10 [years] sentence agreement and failed to object that the obstruction of justice enhancement was not in the [PSI] nor brought up by any federal authority up until the date of sentencing. This blindsided maneuverability to add obstruction of justice at sentencing broke the no more [than] 10 [years] agreement, [] which I had with AUSA Lombardino, from April 1998.

43

(2).  Obstruction of Justice: Two points were added to my sentence for obstruction of justice, based on a spur of the moment conversation I had with Mr. Maurice Gordon's wife on the telephone after he had been arrested by the State of Texas, and an alleged agreement between Mr. Gordon and myself, whereby, he would hinder, obstruct or impede any investigation headed my way.

When Mr. Gordon was in [s]tate custody immediately after his arrest, I spoke with Mrs. Gordon, on the telephone saying essentially, (a) find out where he is and what is going on (b) tell him not to say anything (c) and tell him I was on it[.] Much later when Mr. Gordon's state case became a federal case the instant case that he debriefed with the federal authorities and willingly answered every question to their satisfaction proving there was no agreement to obstruct between us Mr. Gordon, never went to trial in either state or federal court making AUSA Lombardino, statements to the Court misleading and totally [contradicted] by the record.  Mr. Ramirez, was unprepared at sentencing for the obstruction enhancement, he did not ask the Court for extra time to prepare, investigate or call witnesses, did not object to the erroneous information submitted by AUSA Lombardino, about Mr. Gordon, going to trial because he never did, or about an agreement between us to obstruct justice which is obviously untrue since Mr. Gordon, satisfied the government with his answers to their questions.

(3).  Acceptance of Responsibility: The perception I have always had of my role in the organization was that of messenger or gofer or indian, but certainly not a chief. I lived like an indian, was paid like an indian, and in my honest opinion- acted like [an] indian.  I was (sic) what a chief earned, where the they lived, how they lived and the control and authority they held.  My perception is how I see things as they pertain to me and to say that I minimized my role is not true from my point of view.  I plead[ed] guilty  years before I was sentenced and I explained my role from my [perspective] and was never told by Mr. Ramirez, that I was not doing enough to receive the 3 points for acceptance of responsibility.  I took credit for what was mine and spoke up when it was not.  Mr. Ramirez, certainly had the time to inquire as to my acceptance of responsibility and to bring to my attention the probation[] department'[s] dissatisfaction with my acceptance.  In the over 5 [years] I spent in jail before sentencing Mr. Ramirez, never found out if I had satisfied the requirements in place to insure his client would receive the acceptance of responsibility he deserved.  I would always inquire when talking to him by phone as to the status of things and his constant reply was that we were still waiting on the (PSI), and that he was taking care of it.  (Document No. 5363, Exhibit 1) (emphasis in original).

In addition, Gonzalez submitted an affidavit of his brother, Luis Jaime Gonzalez, which states in

pertinent part:

44

My brother's arrest came in November 1996 and was charged with several counts which included conspiracy and money laundering. His attorney George Allen Ramirez from Rio Grande City was hired the day after his arrest and he was immediately to represent my brother. It took nearly two years (1998), until a deadline was established by AUSA Lombardino for Rene to plea guilty or risk going to court and maybe face a stiffer sentence. Mr. Ramirez mentioned to me that part of the agreement was for Rene to accept his responsibility and to debrief as to his role in the case. Also, that by pleading guilty before the deadline he and his wife Yvette, would get a better deal. After this took place, Mr. Ramirez spoke to me and said that Rene was pleading guilty to approximately 460 [pounds] and that the money laundering charge would not affect him. He also stated that if everything goes o.k. that Rene was looking at a 10 year minimum sentence, but that he would qualify for points taken off the guidelines due to him having 1) accepted responsibility and debriefing, 2) safety valve, for being a first time offender.

After approximately two more years, I called Mr. Ramirez asking as to the status of my brother's case. He mentioned that everything was still in process and that we were waiting for the PSI reports. I proceeded in explaining to him that my brother had been calling me worried that the prosecution might pull back from the deal they had originally made with him and that he was reconsidering pulling his plea. Mr. Ramirez explained to me that something like that would only hurt Rene and Yvette. That he believed that the government knows that Rene's role was minimum and that there was no way Rene would get more than 10 years. Yet, he also stated that AUSA Lombardino was a person that could backstab you if you made things rough for her. Therefore it was best to leave thing that way. After speaking to my brother, he explained to me that he found out about other defendants getting their PSI's and that in almost every case, the PSI's were exaggerated as to the defendant['s] relevant conduct and that their sentencing would be affected due to the information [in] their PSI's.

As to some conversation with Mr. Ramirez relevant to PSI's and such, Mr. Ramirez explained that PSI information that could work against my brother, was that which could be proven NOT hearsay. Yet, he was concerned because he also heard that most defendants that were being sentenced were getting stiffer sentences than that which their attorney's had thought were the agreements. Even when Mr. Ramirez realized that stiffer sentences were being given, he never traveled to Houston, Texas to meet with my brother or to meet with AUSA Lombardino to check on the status of the case. In one instance he did mentioned to me that AUSA Lombardino was not satisfied with Rene's debriefing, that Rene might be keeping back information from her. Yet Mr. Ramirez stated to me that Rene's debriefing was only as to his responsibility in the case, not 5K1, which is full participation against others, which included testifying in court.

After yet another year, Mr. Ramirez calls me to inform me that Rene's PSI was in, and that it did not look good.  He explained that the government had perceived him to be a manager, supervisor individual in the organization and that his money laundering had been exaggerated to be in the hundreds and thousands of dollars. Also that his relevant conduct as to quantity increased to approximately 8000 [pounds] of marijuana, and that he had obstructed justice with his role with a gentleman by the name of Maurice Gordon.  I proceeded in asking him what was the next step that it was obvious the PSI was not acceptable and that I felt Rene was not getting a fair deal.  He told me that the procedure was that he would file some motions protesting the PSI statements.  He also explained that he would have an opportunity to argue those motions at the time of sentencing. I told Mr. Ramirez that I felt that it was his duty to make a trip to Houston, Texas to explain all this to Rene and to make sure that everything was O.K. with him, because I felt that the PSI was over extended as to what my brother's perception of the truth was.

Finally, the day of sentencing came and my brother had his moment of speaking out for himself.  I felt that Mr. Ramirez did nothing to help him at the time of sentencing and that if it would not of been for Rene's questioning as to how the government could reach such conclusion as to his role in the case, he could of probably been given even a stiffer sentence than the one he received.  I honestly believe that my brother's role was no more than that of a messenger, or indian, not a supervisor, and that the monies laundered as stated are unproven.  Why were there no fines?  Also, the quantities of marijuana were unproven.  There is no factual evidence of these quantities, only hearsay or exaggeration as to what the prosecution perceives to be the truth.  I believe the prosecution rebelled against Rene and knew that Rene was a minor participant, but yet still went forward in punishing him because in their mind Rene failed to accept complete responsibility.  (Document No. 5363, Exhibit 2).

In response, the Government has filed an Amended Answer and Amended Motion for Summary Judgment (Document Nos. 5429, 5430).  According to the Government, Gonzalez' claims are refuted by the record, which clearly establishes that Gonzalez' plea was knowing and voluntary, that he was aware of the maximum penalties, and that he understood that any prediction of a sentence by counsel was a prediction and not a promise.  Gonzalez has filed a Response to the Government's Amended Motion for Summary Judgment.  (Document No. 5413).  Finally, Gonzalez has filed a Notice of Judicial Cognizance (Document No. 5405), in which he suggests that his sentence is

contrary to the holding of the United States Supreme Court in *Blakely v. Washington*, 542 U.S. 296,

524 S.Ct. 2531 (2004).[5]

### II. Motion to Amend to assert *Blakely/Booker* claim

On September 13, 2004, Gonzalez filed a Notice of Judicial Cognizance (Document No.

5405), in which he suggests that he should be allowed to argue that his sentence enhancement was

unconstitutional in light of *Blakely*. Gonzalez' Notice of Judicial Cognizance has been construed

as a Motion for Leave to Amend/Supplement his § 2255 motion.

Federal Rule of Civil Procedure 15 governs amended and supplemental pleadings, and the

law is clear that Rule 15 applies to amendments of § 2255 motions. *See United States v. Saenz*, 282

F.3d 354. 356 (5th Cir. 2002) ("Every circuit that has addressed this issue agrees the [AEDPA's] one

year statute of limitations does not render Rule 15 inapplicable to federal habeas proceedings.").

"Under Fed.R.Civ.P. 15(c), a district court may in its discretion, permit an amendment which

clarifies or amplifies a claim or theory in a timely filed § 2255 petition after AEDPA's one year

statute of limitations has expired." *United States v. Thomas*, 221 F.3d 430, 433-434 (3rd Cir. 2000).

Conversely, an amendment under Rule 15(c) should not be allowed where the movant seeks to add

an entirely new claim or new theory of relief. *Id.* "An amended habeas petition does not relate back

(and thereby escape AEDPA's one year time limit) when it asserts a new ground for relief supported

by facts that differ in both time and type from those the original pleading set forth." *Mayle v. Felix*,

___U.S.___, 125 S.Ct. 2562 (2005). Because *Blakely/Booker* is a new theory of relief, supported

---

[5] Because of the intervening decision by the United States Supreme Court in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005), which applied *Blakely* to the Federal guidelines, the Court refers to both decisions as *Blakely/Booker*.

by facts that differ in type and time from his original § 2255 motion, Gonzalez is not entitled to amend his § 2255 motion under Rule 15.

Moreover, even assuming that Gonzalez' claim under *Blakely/Booker* related back to his § 2255 motion, Gonzalez should not be allowed to amend his original § 2255 motion because *Blakely/Booker* does not apply retroactively to cases on collateral review. As a result, the proposed amendment would be futile.

Gonzalez argues that the district court's sentencing determination is contrary to the Supreme Court's decisions in *Blakely v. Washington*, 542 U.S. 296, 524 S. Ct. 2531 (2004) and *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005) because the Court, and not a jury, enhanced his sentence. In *Blakely*, the Supreme Court invalidated the State of Washington's sentencing scheme, whereby a judge could possibly sentence a defendant to a punishment beyond a statutory range on the basis of judicially determined facts. *Id.* at 2538. In doing so, the Supreme Court applied the rule in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), which requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." The Supreme Court in *Blakely* expressly declined to state whether its decision applied to the Federal Sentencing Guidelines. *Id.*

The Supreme Court, in its intervening decision, *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738 (2005), extended its holding in *Blakely* to the Federal Sentencing Guidelines, and concluded that there was "no distinction of constitutional significance between the Federal Sentencing Guidelines" and the state sentencing scheme at issue in *Blakely* and, in keeping with its earlier decision in *Apprendi*, stated: "Any fact (other than a prior conviction) which is necessary to

support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Id.,* 125 S.Ct. at 756. To remedy the guidelines' Sixth Amendment problem, the Supreme Court severed and excised 18 U.S.C. § 3553(b)(1), which required mandatory application of the guidelines. *Id.* at 756-57, 765. As a consequence, the guidelines are now advisory in all cases. *Id.* at 757. Because *Blakely* and *Booker* were decided after Gonzalez' conviction in the instant case became final, it must be determined as an initial matter whether *Blakely/Booker* should be retrospectively applied. The Supreme Court has not stated whether the rule announced in *Blakely* and *Booker* apples retroactively to cases on collateral review. However, the Fifth Circuit addressed this issue as to initial § 2255 motions, and has concluded that *Booker* does not apply retroactively to an initial § 2255 motion. *United States v. Gentry,* 432 F.3d 600 (5th Cir. 2005). Because *Booker* does not apply retroactively in initial § 2255 proceedings, Gonzalez is not entitled to relief under *Blakely/Booker,* and his Notice of Judicial Cognizance (Document No. 5405) should be DENIED as untimely and futile.

## III. Guilty Plea Claims

Claims of ineffective assistance of counsel are generally measured by the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had. *Strickland*, 466 U.S. at 687. Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable. *Id*. at 687-88. The prejudice element requires a petitioner to prove that absent the

49

disputed conduct of counsel, the outcome would have been both different and more favorable. *Id*. at 694-95. Under *Strickland*, a petitioner must establish both deficiency and prejudice prongs to be entitled to habeas relief. The failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *United States v. Seyfert,* 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing *Strickland*). To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Under the prejudice prong of *Strickland,* a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have been different. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel. The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record. Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984). The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland,* 466 U.S. at 690. "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic

choices." *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)).  The court's role "under § 2255 is not to audit decisions that are within the bounds of professional prudence." *United States v. Molina-Uribe*,  429 F.3d. 514, 518 (5th Cir. 2005), *cert. denied*, (2006).  In addition, conclusory allegations of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition.  *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

With respect to guilty pleas, the prejudice requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).  Thus, Gonzalez "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.*  As to the specific examples of ineffective assistance of counsel which Gonzalez cites to in support of his ineffectiveness claims relating to his decision to plead guilty, such as that he was misled about the length of his sentence, and those claims relating to sentencing, such as counsel's failing to argue that the Government had promised a ten year sentence, failing to challenge the drug quantity he was held accountable for, failing to argue for acceptance of responsibility, and failing to challenge the sufficiency of Indictment, the record either affirmatively shows that Gonzalez' counsel was not deficient or there is no evidence that the alleged errors prejudiced Gonzalez within the meaning of *Strickland.*

Gonzalez claims that the guilty plea was not knowing because it was based on counsel's misrepresentations about a sentence of ten years.  According to Gonzalez, his counsel failed to take into account the effects of relevant conduct in calculating his guideline sentence.  Gonzalez contends

51

that he would not have pleaded guilty had he known that the conduct of dismissed counts and that of co-conspirators would be considered for sentencing purposes.  Gonzalez further contends that counsel failed to advise of possible increases to his base offense level for his role in the offense and for obstruction of justice.  He further argues he pleaded guilty based on counsel's assurance that he would receive a three level reduction for acceptance of responsibility.  Gonzalez contends that because his counsel failed to explain the guidelines, he entered his plea "blindly with no appreciation of the consequences."  Gonzalez contends that because he was unschooled in the law, and had no prior contact with the criminal justice system, he relied on his attorney's assurances regarding a ten year sentence and that the Government would be more lenient on his wife, and has been prejudiced by a seventeen year sentence.

"Solemn declarations in open court carry a presumption of verity, forming a formidable barrier in any subsequent collateral proceeding."  *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998) (quoting *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977)).  However, a defendant such as Gonzalez may obtain habeas relief on the basis of misrepresentations as to what a sentence will be, notwithstanding statements made in open court, by showing the exact terms of the alleged promise, when, where and by whom the promise was made, and the precise identify of an eyewitness to the promise.  *Cervantes*, 132 F.3d at 1110 (citing *Harmason v. Smith*, 888 F.2d 1527, 1529 (5th Cir. 1989)).  Consequently, absent independent evidence that disputes Gonzalez' own testimony which he gave during his Rearraignment, his ineffective assistance of counsel claims based on counsel's erroneous estimate of his sentencing exposure fails.   Here, because Gonzalez has failed

to come forward with credible, independent evidence, which would dispute his sworn statements at his Rearraignment hearing, his claims fail.[6]

Moreover, regardless of whether Gonzalez' attorney knew of, or discussed with him, his relevant conduct and the application and effect of relevant conduct in calculating his sentence, and possible increases to his base offense level for his role in the offense and for obstruction of justice, given Gonzalez' sworn statements at his Rearraignment hearing, which are entitled to the presumption of truthfulness, Gonzalez has not shown that he was unaware that he could be sentenced to more than ten years.  For example, at Gonzalez' Rearraignment Hearing, he acknowledged, under oath, that he could receive up to a  life sentence for count one (conspiracy to possess with intent to distribute 1000 kilograms or more of marijuana), and up to twenty years for count five (money laundering).  In addition, Gonzalez' stated that no representations or promises had been made as to his sentence, that *only* the Court would determine his sentence he would receive after receiving and reviewing the PSR and objections made by Gonzalez to the PSR, and that he could not withdraw his plea if his sentence was more severe than he expected.  Gonzalez repeatedly acknowledged that he

---

[6] Gonzalez attached to his Memorandum of Law in Support of § 2255 motion, the affidavits of himself and of his brother.  With respect to Gonzalez' request for an evidentiary hearing, to be entitled to an evidentiary hearing, Gonzalez must show "(1) the exact terms of the alleged promise, (2) exactly when, where, and by whom the promise was made, and (3) the precise identity of an eyewitness to the promise."  *United States v. Cervantes*, 132 F3d 1106, 1110 (5th Cir. 1998) (citing to *Harmason v. Smith*, 888 F.2d 1527, 1529 (5th Cir. 1989)).  As such, "if the defendant produces independent indicia of the likely merit of [his] allegations, typically in the form of one or more affidavits from reliable third parties, [he] is entitled to an evidentiary hearing on the issue.  If, however, the defendant's showing is inconsistent with the bulk of [his] conduct or otherwise fails to meet [his] burden of proof in light of other evidence in the record, an evidentiary hearing is unnecessary."  *Cervantes*, 132 F.3d at 1110.  (Citations omitted).  Here, because Gonzalez' brother was not present when the alleged promises or representations concerning Gonzalez' sentence were made and the discussions concerning leniency for Gonzalez' wife, Gonzalez is not entitled to an evidentiary hearing, as his brother's affidavit does not satisfy the requirements of specificity necessary to warrant an evidentiary hearing.

understood that no one could tell him with specificity the length of sentence which would be imposed by the Court and that his sentence would be determined by the Judge *only*.  In particular, Judge Harmon, in discussing the sentencing process at his Rearraignment hearing advised: "this is the *first* time all of us will find out what your sentence is going to be in this case."  (Document No. 4974, p. 20) (emphasis added).

Similarly, the written Plea Agreement stated he could receive a sentence of up to life imprisonment for count one, and twenty years for count five, that his sentence would be imposed in accord with the Sentencing Guidelines, that the Court could impose *any sentence* within the statutory maximum, that the sentence to be imposed was within the discretion of the court, and that imposition of the maximum sentence would not be grounds to withdraw his plea.  Indeed, the written Plea Agreement states: "[t]he United States has not and does not make any promises or representations as to what sentence the Court will impose."  (Document No. 2766, ¶6).  As such, even if Gonzalez' counsel had erroneously represented that he would receive a sentence of ten years by entering into the plea agreement, Gonzalez, nonetheless, was aware when he entered the Plea Agreement and at the time of his Rearraignment hearing, that his sentencing exposure was a mandatory minimum sentence of 10 years or 120 months, and  could be life imprisonment for count one, and up to twenty years on count five.  Likewise, the record refutes Gonzalez' contention that the Government, as part of the plea agreement, agreed to a set sentence and to be lenient towards Gonzalez' wife should Gonzalez plead guilty to counts one and five.  Contrary to Gonzalez' allegations, neither the written Plea Agreement nor the transcript of the Rearraignment Hearing refer to a ten year sentence or the promise of leniency towards Gonzalez' wife.  Instead, the record shows that Gonzalez testified he agreed with the Government's summary of the terms of the plea, that he had gone over the agreement

with his counsel and understood the terms thereof, had no questions relating to the agreement, and that there were "no side agreement or under the table agreement or agreement of any kind" that he was relying on as part of his plea agreement.  (Transcript of Rearraignment Hearing, Document No. 4974, p. 13).

Given the exchange between Gonzalez and the Court at his May 29, 1998, Rearraignment Hearing, which leaves no doubt that Gonzalez knew he faced up to a life sentence on count one and twenty years on count two, and the explanation of the sentencing process, and in particular, that his sentence would not be known until the sentencing hearing, simply because his counsel anticipated a substantially shorter sentence, Gonzalez has not shown prejudice within the meaning of *Strickland*. Gonzalez has failed to demonstrate that his guilty plea was not knowing, voluntary, and intelligent, and has likewise failed to overcome the presumption under *Strickland* that "counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689.  (quotations omitted).  Even if counsel had predicted a much lesser sentence, Gonzalez' reliance on that sentencing estimate would have been unreasonable given the numerous warnings he received at his Rearraignment that the maximum sentence for the drug conspiracy to which he was pleading guilty to was life, and and up to twenty years for money laundering.  By pleading guilty, Gonzalez had the potential for a less harsh sentence given that there was a chance for a reduction for acceptance of responsibility.  In contrast, had Gonzalez gone to trial, it is highly likely that the jury would have found him guilty, based on the evidence, and there would have been no chance of a reduction for acceptance of responsibility.

As for Gonzalez' effective assistance of counsel claims relating to sentencing, such as counsel's failure to argue that there was a breach of the plea because the government had agreed to a ten year sentence, failing to the object to the PSR's calculation of drug quantity, and to further challenge the sufficiency of the factual basis to support Gonzalez' plea given that Gonzalez admitted to being responsible for 480 pounds of marijuana, and for failing to argue for a reduction for acceptance of responsibility, the record refutes Gonzalez' contention.  The record shows that counsel filed written objections to the PSR, in which he objected to the drug quantities, the absence of a reduction for acceptance of responsibility, and increases to the base offense level based on Gonzalez' role in the offense and obstruction of justice.  (Document No.4648).  In addition, counsel urged the Court  to sentence Gonzalez to a ten year sentence.  (Transcript of Sentencing Hearing, Document No. 4817, pp. 12-13, 18-19, 21-30).  Because counsel's performance was not deficient and there was no resulting prejudice within the meaning of *Strickland*, no relief is available on this ineffectiveness claim.

## V.  Due Process Claim

Finally, Gonzalez contends he was denied due process when the Court ordered the United States Attorney's Office to prepare factual summaries to be used by the probation officer in preparing the PSR.  According to Gonzalez, by allowing the Government to prepare factual summaries, the probation office failed to conduct its own independent, and thorough investigation, and that by relying on the Government's factual summaries, the probation officer no longer acted as a neutral information gatherer.  Gonzalez contends that "the probation officer purposefully and intentionally dragged her feet and waited and waited and waited until such time as all other co-

56

defendants pled guilty and fabricated their respective stories on debriefing to curry favor with the

Government." (Document No. 5413, p. 11).   Gonzalez also argues that counsel was ineffective for

failing to object to this process.         Probation Officers are appointed by the court in the district in

which they serve and "are under the direction of the court making the appointment."  18 U.S.C. §

3602.   With respect to the PSR:

> The purpose of the [PSR], prepared by a probation officer is to aid the court in
> fashioning a fair and just sentence within the limits of its authority granted by
> Congress and the Sentencing Guidelines.  *See* 18 U.S. C. § 3552; *United States v.
> Charner Indus., Inc,* 711 F.2d 1164 (2nd Cir. 1983).   The [PSR] is designed to
> present as complete a picture about the defendant as possible, with information about
> his or her family, education, finances, health, prior criminal conduct, as well as the
> facts and circumstances surrounding the pending charges before the court.
> It is well established that

*United States v. Loeper,* 132 F.Supp.2nd 337, 339 (E.D.Pa. 2001).   In addition, Rule 32 of the

Federal Rules of Criminal Procedure allows for a defendant, such as Gonzalez to object to factual

findings and application of the findings to the guidelines.   *See* FED.R.CRIM.P 32(F)(1) (allowing

the parties to "state in writing any objections, including objections to material information,

sentencing information, sentencing guideline ranges, and policy statements contained in or omitted

from the report:); 32(i)(1)(C) (requiring the sentencing court to "allow the parties' attorneys to

comment on the probation officer's determinations and other matters relating to an appropriate

sentence').

Here, the probation officer relied not only on the summaries provided by the Government,

but also relied on Title III intercepts, information from case agents, and cooperating witnesses.  Both

the Government and Gonzalez were given the opportunity to object to the PSR, which they did.

Moreover, at Gonzalez' Rearraignment Hearing, Judge Harmon explained the role of the probation

officer, and further explained that sentencing would not be immediate.  Upon this record, where there

has been no showing that probation officer was not neutral, Gonzalez' due process and

ineffectiveness claims fail.  *See Miller v. Johnson*, 200 F.3d 274, 284 (5th Cir. 2000) (conclusory

allegations are insufficient to raise cognizable claims of ineffective assistance of counsel).


## VI.  Conclusion and Recommendation

Based on the foregoing, it is

RECOMMENDED, that Movant's § 2255 Motion to Vacate, Set Aside or Correct Sentence

(Document No. 5299), and Notice of Judicial Cognizance (Document No. 5405) all be DENIED, and

that the Government's Amended Motion for Summary Judgment (Document No. 5430) be

GRANTED, and that this § 2255 proceeding be DISMISSED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented

parties of record.  Within 10 days after being served with a copy, any party may file written

objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D.

Texas.  Failure to file objections within such period shall bar an aggrieved party from attacking

factual findings on appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir.

1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en

banc).  Moreover, absent plain error, failure to file objections within the ten day period bars an

aggrieved party from attacking conclusions of law on appeal.  *Douglass v. United Services

Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections

shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this 16th day of May, 2006.


Frances H. Stacy
United States Magistrate Judge